Filed 11/25/13  P. v. Vasquez and Juarez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>HUBER JUAREZ VASQUEZ and MANUEL HERNANDEZ JUAREZ,<br><br>     Defendants and Appellants. | G046668<br>(consol. w/ G047179)<br><br>(Super. Ct. No. 09CF2301)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, W. Michael Hayes, Judge.  Reversed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Huber Juarez Vasquez.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant Manuel Hernandez Juarez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

After the trial court replaced the jury foreperson during deliberations in a joint trial, the newly-constituted jury convicted Huber Juarez Vasquez and his father, Manuel Hernandez Juarez, of murder for slaying the man who smuggled Vasquez into the country, Victor Camacho. The jury also convicted defendants of attempted murder for wounding Camacho's associate, Jose Garcia. Defendants contend replacing the juror violated due process and their Sixth Amendment right to a jury trial, while the Attorney General asserts the trial court was justified in replacing the juror because she could not differentiate between first and second degree murder. The record, however, does not support the Attorney General's contention and does not support as a "demonstrable reality" the juror's inability to perform her duty. (*People v. Williams* (2011) 25 Cal.4th 441, 448 (*Williams*).) The trial court therefore erred in dismissing the juror, and we reverse the judgment.

We find no merit in Vasquez's argument his retrial is barred on due process grounds because the prosecution delayed filing the murder and attempted murder charges against him. The trial court found no prejudice in the 8-year delay that arose when Vasquez implicated himself in the unsolved shooting. Because the record supports the trial court's ruling, there is no bar to retrial.

The reversal of the judgment renders defendants' other contentions moot. Consequently, we need not address whether: (1) the prosecutor's alleged failure to adequately sanitize references to Juarez in Vasquez's statement to Oregon police created *Aranda-Bruton* error; (2) the prosecutor committed misconduct in referring to Vasquez's police statement to suggest Juarez's guilt and in commenting on his lack of an alibi; (3) the trial court erred in failing to instruct the jury they had to agree on (a) the facts underlying the murder or (b) the overt act underlying Juarez's and Vasquez's alleged

2

conspiracy to commit the crime of brandishing a firearm; (4) the court erred in failing to identify murder and attempted murder as natural and probable consequences of the alleged brandishing conspiracy; and (5) the court erred in failing to instruct the jury self-defense could apply not just to the murder and attempted murder charges but also to brandishing.

I

FACTUAL AND PROCEDURAL BACKGROUND

Because we reverse the judgment, we discuss the facts of the alleged offense only in a cursory fashion and we limit the procedural background to the issues we address on appeal.

Vasquez, Alfonso Paredes, Cesar Pureco, Marcos Macedo, and two other aliens crossed into the United States in April 2000 with the aid of smugglers. They stayed at a safe house where Camacho and Garcia joined the operation and loaded them into a Chevrolet Suburban. Garcia drove the vehicle to a rendezvous at a fast food restaurant in Santa Ana, where Vasquez expected his father to meet him and pay the smugglers. Instead, according to Vasquez, his uncle Roman appeared, handed Vasquez a nine-millimeter handgun, kept a much larger gun for himself, and when a quarrel erupted over the payment amount, Vasquez pointed the gun at Garcia so he could exit the vehicle, but Garcia reached for something on the floor of the front compartment. Vasquez fired his weapon and heard two or three more shots, which he believed came from his uncle's gun. Vasquez and two or three others escaped with Roman in a blue car.

Police responding to the scene found Camacho slumped over in the passenger seat of the Suburban and Garcia bleeding nearby, outside the vehicle. Garcia

3

underwent surgery and survived, but Camacho died from a gunshot wound to his chest. The police also found a .45-caliber bullet casing at the scene.

Paredes told investigators that before the Suburban reached Santa Ana, he overheard the driver engaged in a cell phone call in which he stated "the money" should be brought to their destination. The driver made another call before they arrived. When they arrived, Paredes saw "Juan" (later identified as Vasquez) exit the vehicle and then someone who arrived in a blue car handed him a gun. An argument broke out between the smugglers and Vasquez and his companion, Vasquez leaned back into the vehicle through a back seat window, and although Paredes ducked down, he saw the gun discharge and hit the driver. Pureco also gave a statement in which he explained he had been returning from the bathroom when he saw Vasquez with a gun outside the passenger side of the Suburban, and a struggle ensued when the front passenger reached for the gun and it discharged, striking the driver. The police also interviewed Macedo, but like Paredes and Pureco, he was unable to identify Juarez or his blue car as being at the scene.

The police found the smugglers' cell phone in the Suburban and traced the last number called to a home telephone number assigned to Juarez. Officers found a receipt in Juarez's car for repair work on a .45-caliber handgun, but the receipt was in Roman Hernandez's name. Juarez denied any involvement in the shooting and explained Roman was his brother, but he did not know where he was, and the police could not locate him. In a police interview, Juarez admitted and then recanted previously having obtained a driver's license with his own photograph but in the name of "Roman Juarez."

The case lay dormant for a year, but in July 2001, Oregon police arrested Vasquez in a bizarre incident where farm nursery employees saw Vasquez drive erratically from the freeway onto the nursery property, exit his vehicle, and fall to the

4

ground "on his hands and knees and crying and acting really strangely, really sorrowful, and pleading" for his life in the nursery field. The responding officer arrested Vasquez for reckless driving, trespassing, and on suspicion of driving under the influence, but the officer did not administer a field sobriety or breath test because of Vasquez's agitated condition. Vasquez stated he feared for his safety because "he had done something really, really bad . . . a long time ago," and people were chasing him. At the jail, Vasquez stated he "did not mean to shoot the man," but he "was hitting him when the gun went off" in the parking lot of a fast-food restaurant in Santa Ana, California.

Detective Joseph Garcia of the Oregon State Police conducted an initial interview of Vasquez in which he spontaneously stated he had "accidentally" discharged a firearm at or near a McDonald's on Bristol Street in Santa Ana. He shot a "coyote" or "coyote smuggler" who had brought him into the United States.

After consulting with the Santa Ana Police Department, Detective Garcia interviewed Vasquez again the next day, and they role-played the shooting with Garcia as the driver and Vasquez seated directly behind him. Vasquez denied seeing either of the "coyotes" with a gun, but explained his gun went off when he thought the driver might be reaching for something in the floorboard area. He also explained he was afraid the smugglers were not going to release him because they had threatened during the trip in the Suburban that "if more money was not brought, then the people . . . would be harmed." Vasquez told Garcia that his uncle Roman was the person who showed up at the rendezvous and handed him the gun, but in the eventual trial, the trial court excluded this information.

Eight years passed until September 15, 2009, when Orange County prosecutors filed criminal charges against Vasquez and Juarez after learning Juarez was

about to be deported by federal immigration authorities. Oregon authorities arrested Vasquez and he was extradited to California. Before trial, both defendants moved to dismiss the charges for preaccusation delay. The trial court denied the motion without prejudice, and defendants renewed their motion after the jury's guilty verdicts. The trial court conducted a hearing in which the prosecution offered no explanation for the delay, but the trial court explained: "I cannot say the defendant has demonstrated the actual prejudice required. All I've heard is speculation about what somebody might say, might not have said. I don't know what the witness in Mexico said to whom. So I cannot say that, based on this record, the defendant has been able to meet his burden, and the motion is denied."

We address in the discussion below the proceedings that led to the foreperson's discharge during deliberations.

## II

## DISCUSSION

A. *Preaccusation Delay Does Not Require Dismissal of the Charges*

Vasquez argues the 8-year delay before he was charged following his interview with the Oregon police violated his due process right to a fair trial. He acknowledges his right to a speedy trial under the state and federal Constitutions is not implicated because those rights attach, respectively, when a felony complaint is filed (Cal. Const., art. I, § 15) or the defendant is held to answer (U.S. Const., 6th Amend..; see generally *People v. Martinez* (2000) 22 Cal.4th 750, 754, 762-763 (*Martinez*)). "'"Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions."'" (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*).)

6

"""The right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.""" (*Ibid.*)

Relying on inapposite federal speedy trial cases, Vasquez argues the length of the delay alone establishes a presumption of prejudice. (*Doggett v. U.S.* (1992) 505 U.S. 647, 655.) But there is no presumption of prejudice for due process claims based on preaccusation delay. (See *United States v. Lovasco* (1977) 431 U.S. 783, 789 (*Lovasco*); accord, *Martinez, supra*, 22 Cal.4th at p. 755.) Rather, statutes of limitations provide the primary protection against stale criminal charges (*Lovasco*, at p. 789; *People v. Nelson* (2008) 43 Cal.4th 1242, 1250), and there is no statute of limitations for murder (Pen. Code, § 799; *People v. Vasquez* (2004) 118 Cal.App.4th 501, 505).

Accordingly, the defendant bears the burden to demonstrate prejudice arising from the delay. (*Cowan, supra*, 50 Cal.4th at p. 430.) """The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." [Citation.]' [Citation.]" (*Ibid.*) In balancing these interests, "'it is important to remember that prosecutors are under no obligation to file charges as soon as probable cause exists but before they are satisfied that guilt can be proved beyond a reasonable doubt or before the resources are reasonably available to mount an effective prosecution. Any other rule "would subordinate the goal of orderly expedition to that of mere speed." [Citation.]' [Citation.] On the other hand, "'[Prosecutors] cannot simply place gathered evidence on the 'back burner' hoping that it will some day simmer into something more prosecutable.'" [Citation.]" (*People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1329 (*Mirenda*).)

7

A "minimal," prima facie showing of prejudice requires the prosecution to explain the reasons for the delay. (*Craft v. Superior Court* (2006) 140 Cal.App.4th 1533, 1540-1541.) But the trial court "must engage in the balancing process only if the defendant has shown actual prejudice. [Citation.] The reason is simple: 'If defendant fails to show prejudice, the court need not inquire into the justification for the delay since there is nothing to "weigh" such justification against.' [Citation.]" (*Id.* at p. 1541.) The balancing test therefore operates on a sliding scale; if the defendant meets his initial burden, then "'[e]ven a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. By the same token, the more reasonable the delay, the more prejudice the defense would have to show to require dismissal.' [Citation.]" (*People v. Conrad* (2006) 145 Cal.App.4th 1175, 1185.)

"Whether preaccusation delay is unreasonable and prejudicial to a defendant is a question of fact." (*Mirenda*, *supra*, 174 Cal.App.4th at p. 1330.) On appeal, we examine whether the trial court's determination of prejudice, or a lack thereof, is supported by substantial evidence. (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 911-912.) The defendant must establish actual prejudice shown by particular facts, not bare conclusory statements. (*Crockett v. Superior Court* (1975) 14 Cal.3d 433, 442.) "When unjustified prejudice to the defendant's ability to defend has been established[,] there can be no question that ... dismissal [is] required." (*Serna v. Superior Court* (1985) 40 Cal.3d 239, 263-264.)

Here, the trial court concluded Vasquez failed to establish the requisite prejudice to require the prosecution to justify the delay, and substantial evidence supports the trial court's conclusion. Vasquez asserts prejudice arose from the fact "numerous specific pieces of *potentially* relevant evidence were lost to the delay . . . ." (Italics

8

added.) But it is not enough to speculate about potentially relevant evidence; it remains the defendant's burden to demonstrate actual prejudice. Vasquez fails to establish prejudice by the absence of certain tangible evidence, including the vehicle in which he was smuggled and Camacho was shot, the demolition of the fast food restaurant where the shooting took place in the parking lot, and the loss of the Oregon officer's interview notes. He also claims the delay triggered prejudice arising from his intoxicated statement to Oregon police because "it was too late to perform any physical tests to determine his level of intoxication, which could have undermined the reliability or voluntariness of his statements."

The last of these claims is patently without merit. The inability to test Vasquez's intoxication level bears no relation to his charging delay claim because the inability arose from the transience of alcohol or illicit substances in his system, not from anything the prosecutor did or failed to do. Moreover, the Oregon police officer reinterviewed Vasquez the day *after* his roadside apprehension, and nothing in the officer's testimony at trial suggested Vasquez remained under the influence during the second interview, nor did Vasquez elicit in cross-examining the officer anything to suggest Vasquez was incoherent at the time of that interview. Indeed, Vasquez *relies* on the second interview for his claim of self-defense. Specifically, his attorney argued in closing argument that Vasquez feared the smugglers would extort additional funds from his family based on his interview claim that he overheard their cell phone demand for "more money," and he also stated in the interview that he saw Camacho reach down towards the floor of the vehicle before he shot him. In these circumstances, it is speculative to conclude Vasquez might have gained anything to bolster his defense if only he had been subjected to an unspecified physical test for intoxication.

9

Vasquez's claim of prejudice based on the loss of the interviewing officer's notes is similarly speculative and unavailing. Vasquez complains that the Attorney General in her briefing "does not explain why the loss of the notes was not prejudicial," but this misconstrues the burden, which rested on Vasquez to establish prejudice. He suggests the notes "*could have* clarified Vasquez's statement" (italics added) to the Oregon officer, but this phrasing betrays the speculative nature of his claim, particularly that a potential clarification necessarily would have benefited Vasquez and therefore shown prejudice.

Vasquez argues "[t]he clearest demonstration of prejudice . . . came from the loss of percipient witnesses and the faded memory of the single available witness." Specifically, two of the smuggled passengers in the Suburban, Macedo and Pureco, could not be found at the time of trial and Garcia, the surviving victim, was imprisoned in Mexico. Pureco's statement to police that, while returning from the restroom, he witnessed "a brief struggle" between the driver and Vasquez, who stood outside the driver's side door, supported Vasquez's version of events and was admitted at trial. The other passenger, Paredes, testified he was the only person remaining in the back seat of the vehicle, but he did not witness the struggle because he ducked down as the confrontation escalated.

Vasquez complains he suffered prejudice from preaccusation delay because "Pureco and the other two witnesses were unavailable to *confirm* [his] claim of self-defense" based on his interview statement that he saw Camacho reach for something on the floor of the vehicle. (Italics added.) The trial court reasonably could conclude Vasquez's claim of prejudice from what absent witnesses might have said was speculative.

10

It is pure speculation that any of the absent witnesses had anything to offer that would benefit Vasquez's defense. Paredes had ducked down and therefore could not see whether Camacho reached for anything and, given Pureco and Macedo were outside the vehicle according to Paredes's and Pureco's testimony, neither appeared to be in position to observe whether Camacho reached toward the floor of the vehicle. Nothing in the police statement of the surviving victim, Garcia, suggests he observed anything helpful to Vasquez or that he was inclined to offer exculpatory evidence, and Vasquez does not rely on him.

Vasquez relies on *Mirenda* for the proposition that the absence of a witness who can confirm an exculpatory account establishes prejudice. *Mirenda* illustrates the type of evidence necessary to show prejudice. There, an eyewitness to a shooting told police after the incident that the victim and the defendant had been arguing and the victim was moving toward the defendant when he was shot, supporting the defendant's self-defense claim. But the witness "recently changed" her story and, in the intervening 27 years since the incident, the detective who had interviewed the witness had died and was therefore unavailable to corroborate or impeach her initial exculpatory account. (*Mirenda*, *supra*, 174 Cal.App.4th at p. 1331-1332.)

Here, in contrast, none of the eyewitnesses gave an initial account exculpating Vasquez, nor did any of them later recant an exculpatory account, which would have demonstrated prejudice in the passage of time and loss of a witness to corroborate the initial account. Instead, Vasquez attempts to spin from the passage of time the mere possibility that some of the witnesses might have offered exculpatory accounts if he had been charged and tried sooner, but this is pure speculation.

11

Similarly, there is no merit in Vasquez's claim that Paredes's fading memory prejudiced him. Paredes had told police he overheard the smugglers demand payment in their phone call along the way to the rendezvous, but by the time of trial he did not recall making this statement. But this lack of recall in no way supports the conclusion Paredes actually heard the smugglers demand *more* money as Vasquez claimed in his own police statement. Vasquez argues that absent "the eight year delay, Paredes could have been questioned about the smugglers' demand for money, other demands and threats made by the smugglers, and details of the entire telephone conversation." But it is pure supposition any of these questions would have yielded information exculpating Vasquez.

Likewise, the trial court reasonably could find no prejudice in the destruction of the smuggler's vehicle or the restaurant where the shooting took place. Vasquez only noted the loss of these potential evidentiary items and made no specific claim of prejudice from their absence. Consequently, we conclude substantial evidence supports the trial court's conclusion Vasquez failed to establish the requisite prejudice to warrant dismissal of the charges for undue delay. The matter therefore properly proceeded to trial.

B.     *The Trial Court Erred by Dismissing the Jury Foreperson*

Defendants contend the trial court violated due process and their right to a jury trial by intruding into the jury's deliberations with invasive questioning of the foreperson that could not help but reveal and chill the jury's deliberations. Alternatively, they argue the court erroneously concluded the foreperson misunderstood the jury instructions, and compounded that error by concluding she could not perform her duty as a juror because she was incapable of understanding the instructions. Penal Code

12

section 1089 provides for removal of a juror and replacement with an alternate for "good cause shown," including death, illness, or that the juror is "unable to perform [her] duty."

We review a trial court's removal of a juror for abuse of discretion. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474 (*Cleveland*).) That discretion is "at most a limited discretion to determine that the facts show an inability to perform the functions of a juror, and that inability must appear in the record as a demonstrable reality." (*People v. Compton* (1971) 6 Cal.3d 55, 60 [reversal where trial court expressly found juror's remarks did not show he "'would be unable to serve,'" but nevertheless dismissed him "'out of an abundance of caution'"].)

The Supreme Court in *Cleveland* cautioned that "a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.) As the court elsewhere explained, "The mental processes of deliberating jurors are protected . . . because '[j]urors may be particularly reluctant to express themselves freely in the jury room if their mental processes are subject to immediate judicial scrutiny. The very act of questioning deliberating jurors about the content of their deliberations could affect those deliberations.'" (*People v. Engelman* (2002) 28 Cal.4th 436, 442-443 (*Engelman*).)

The secrecy of deliberations, however, is not "absolute and impenetrable" (*Engelman*, *supra*, 28 Cal.4th at p. 443), for the trial court retains "a duty to conduct reasonable inquiry into allegations of juror misconduct or incapacity" and "the decision whether (and how) to investigate rests within the sound discretion of the court" (*id.* at p. 442.) (See also *Cleveland*, *supra*, 28 Cal.4th at p. 476 ["The need to protect the sanctity of jury deliberations . . . does not preclude reasonable inquiry by the court into

13

allegations of misconduct during deliberations"].)  For example, the trial court may remove a juror who "actually refuses" (*Engelman*, at p. 442) to deliberate (but see *Cleveland*, at p. 486 [trial court erroneously concluded juror was "'not functionally deliberating'"]), and may also discharge a juror "who proposes to reach a verdict without respect to the law or the evidence" (*Engelman*, at p. 442, citing *Williams*, *supra*, 25 Cal.4th at p. 463).

In *Cleveland*, the high court reviewed a record that did "not establish 'as a demonstrable reality'" the dismissed juror refused to deliberate.  (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)  There, "[a]lthough the jury's initial note to the trial court asserted that Juror No. 1 'does not show a willingness to apply the law,' it became apparent under questioning that the juror simply viewed the evidence differently from the way the rest of the jury viewed it." (*Id.* at pp. 485-486.)  The Supreme Court explained, "The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge.  Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge." (*Id.* at p. 485.)

Here, the trial court expressly recognized, "I don't have somebody who is refusing" to deliberate.  Instead, the court viewed the problem as follows:  "I have somebody who, in some respects, is clearly following the rules . . . .  [¶]  But my inquiry seems to be[:]  is she having trouble with implied malice as a theory?"  The trial court concluded that "[i]f somebody believes that implied malice *requires* premeditation, they

14

are either unable to follow the law because they can't understand it or they're unwilling to accept the law because they believe the law ought to be . . . different." (Italics added.)

The Supreme Court addressed the latter scenario in *Williams*, where a juror refused to follow the law. The juror admitted during deliberations that he disagreed with the law criminalizing unlawful sexual intercourse between a minor and her 18-year-old boyfriend, and would disregard it. The juror explained, "I'm trying as best I can, Judge. And I'm willing to follow all the rules and regulations on the entire rest of the charges, but on that particular charge, I just feel duty-bound to object." (*Williams*, *supra*, 25 Cal.4th at p. 447.) The Supreme Court held that while a jury has the raw power "to disregard, or nullify, the law" and thereby "acquit a criminal defendant against the weight of the evidence" (*id.* at p. 449), a trial court is not obliged to stand idle when it learns a juror intends to disregard his or her oath to follow the law. As the court explained, "A juror who refuses to follow the court's instructions is 'unable to perform his duty' within the meaning of Penal Code section 1089. As soon as a jury is selected, each juror must agree to render a true verdict '"according only to the evidence presented . . . and *to the instructions of the court*"' (Code Civ. Proc., § 232, subd. (b) [])." (*Williams*, at p. 448, original italics.)

Neither party and nothing in the record suggests the foreperson here harbored a willful intent to disregard the trial court's instructions. Willfulness, however, is not the sole or even an indispensable criterion in assessing whether a juror is unable to perform his or her duty. An inability to follow the court's instructions, if apparent in the record as a demonstrable reality, is similarly proper grounds for dismissal. (See *Williams, supra*, 25 Cal.4th at p. 449 [recognizing trial court's authority to discharge a juror unwilling *or* "unable . . . to follow the court's instructions"].)

15

In *Williams*, the Supreme Court favorably cited an earlier case by the same name for the proposition that a juror may "properly [be] discharged because she 'was unable to comprehend simple concepts, was unable to remember events during deliberations such as recent discussions or votes, and was not following the law.'" (*Williams*, *supra*, 25 Cal.4th at pp. 448-449, citing *People v. Williams* (1996) 46 Cal.App.4th 1767, 1780-1781.) Indeed, as the Court of Appeal noted in *People v. Williams*, the dismissed juror had "even attempted to alter the jury instructions." (*People v. Williams*, at p. 1780.) To the contrary, "the jury must follow the court's instructions, 'receiv[ing] as law what is laid down as such by the court.' ([Pen. Code, § 1126.)" (*Engelman*, *supra*, 28 Cal.4th at p. 442.) Accordingly, if a juror deliberately altered the trial court's instructions to eliminate any distinction between first and second degree murder, or the juror proved to be wholly incapable of recognizing the offenses were different, the trial court could properly discharge that juror.

The problem here, however, is that the imprecise questions the trial court posed to the foreperson before dismissing her did not establish as a demonstrable reality that she somehow altered the court's instructions, or even that she misunderstood the law, let alone that she was incapable of understanding or following it. The trial court did not face an easy predicament: "Jury questions can present a court with particularly vexing challenges. The urgency to respond with alacrity must be weighed against the need for precision in drafting replies that are accurate, responsive, and balanced." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1331.) The same is true in conducting careful interviews with jurors to peel back layers indicating potential juror misconduct or a juror's inability to perform his or her duty.

16

Perhaps led astray by the phrasing of an individual juror's note alerting the court its rereading of the instructions had not resolved the matter, the trial court posed two questions to the foreperson before dismissing her, but those questions did not illuminate whether she misunderstood the law or was incapable of understanding it. Specifically, the trial court's first question, "[D]o you believe that implied malice or malice aforethought requires any of the following: premeditation, planning, *or ill intent?*" (italics added), echoed the phrasing of the juror's note, but like the note, erroneously combined portions of the court's own instructions in a confusing manner. In particular, while premeditation, planning, and *ill will* are not required to establish the requisite malice, a murder committed with express malice *does* require unlawful *intent*.[1] Because the trial court's question intermingled the concepts of ill will and unlawful intent in a novel conjunction of "ill intent," the foreperson's "yes" answer did not illuminate whether she misunderstood the law, nor did it suggest that she could not follow the law.

The trial court's second question and lack of follow up did not clarify matters. The trial court asked the foreperson, "Do you believe that there is a difference, a legal difference, in the definitions we've given you between first- and second-degree murder," and immediately dismissed her when she gave the following disjointed reply, "Based on the instruction that was given to us that says the first degree and the second degree definition with [*sic*] the malice aforethought, that the definitions are the same."

---

[1]     As the trial court explained in CALCRIM No. 520, which applies to *both* first and second degree murder, a person who commits murder must act with "a state of mind called malice aforethought," "[m]alice aforethought does not require hatred or *ill will* toward the victim," nor does it "require deliberation or the passage of any particular period of time." (Italics added.) But, of the two kinds of malice aforethought, express malice and implied malice, a defendant "act[s] with express malice" if he or she "*unlawfully intended* to kill" the victim. (Implied malice requires an intentional act the defendant knows by its natural and probable consequences is dangerous, coupled with the defendant's conscious disregard of life in committing the act.)

17

While the foreperson's explanation was not a model of clarity, she correctly articulated, as noted, that first and second degree murder *are* the "same" in that *both* require malice aforethought. (CALCRIM No. 520; see fn. 1, *ante*.) "It is not always easy for a juror to articulate the exact basis for disagreement after a complicated trial, nor is it necessary that a juror do so." (*Engelman*, *supra*, 28 Cal.4th at p. 446.) Jurors are not legal scholars and if the trial court did not understand the foreperson's answer, it could not presume it signaled a misunderstanding of the law. The presumption under the demonstrable reality standard is the opposite. Because there was no basis to conclude from the foreperson's *correct* answer that she misunderstood the law, and that she was incapable of understanding it, the trial court erred in dismissing her.

We observe that the trial court has by statute "a primary duty to help the jury understand the legal principles it is asked to apply." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*).) Penal Code section 1138 provides, "After the jury have [sic] retired for deliberation, . . . if they desire to be informed on any point of law arising in the case . . . the information required must be given . . . ." Here, the jury sent a note to the trial court during deliberations asking, "Does malice aforethought mean premeditation or predetermination?" The jury had begun the note with the following language, but crossed it out: "~~Please explain to us in layman's term[s] what is malice aforethought[t] means [*sic*] premeditation?~~" Clearly the jury sought instruction on malice aforethought, and the trial court responded appropriately by directing the jury to reread its instructions, as follows: "520 — Malice Aforethought [and] 521 [regarding] Deliberate/Premeditation."

But another message from the jury room signed by 11 jurors, and not the foreperson, soon indicated the rereading had not had its desired effect. The note stated:

18

"Your Honor, we have a juror that is unwilling and unable to view the law as presented to us, the jury. [¶] The juror is using [her] own beliefs and presuppositions of what the law is and should be. [¶] I/we trust your judgment in this matter, but in all honesty, the time, effort and taxpayer money will all be wasted unless a change is made."

The trial court called four of the jurors into chambers, one at a time and with counsel observing but silent, and asked them to describe the problem. They believed the foreperson misunderstood the law. When the court inquired whether she was still deliberating, one juror answered: "Yes. We can't get to that point where we can decide [the verdict?] because she's not agreeing with the law, you know, the law that we have. Remember how we had [CALCRIM Nos.] 520, 521? Please read that. She has her own law, something like that." Another juror put it this way: "Let's say we go through a scenario. We put up checklists, and although [the] checklists concur with a certain individual law, we all agree upon it, even the individual [the foreperson], but then [she] disagrees with her own answer." Juror No. 152 concluded the problem was that the foreperson "thinks that premeditation is malice aforethought,"[2] and that first and second degree murder are "the same thing."

The trial court then interviewed the foreperson, who explained there remained "disagreement as to the definition of 'murder'" and a "question or [] confusion" about malice aforethought and its application, despite the trial court's direction to reread its instructions. The foreperson elaborated: "We asked whether malice aforethought is a [*sic*] premeditation or a predetermination, and some of us believe that the . . . premeditation and predetermination only applies to murder one or first-degree murder, rather than it applies to . . . second-degree murder, and I — the instruction is not very

---

[2] We note that premeditation may indeed constitute malice aforethought, as in the case of premeditated murder.

19

clear. Because in the second page of the instruction, it indicated that it's first-degree murder is [*sic*: if?] premeditated and predetermined and willfully, and if that doesn't apply, then you go to the second-degree murder [instruction], which is going to [CALCRIM 521], which is [*sic*: includes the?] definition of malice aforethought, which is the state of malice aforethought, and that's where the hangup is."

It may be that the foreperson misread the word "aforethought" in "malice aforethought" to mean "premeditated," given that the prefix "afore-" and root "thought" mean the same as "pre-" and "meditated." On that view, she may have confused the "malice aforethought" necessary for both first and second degree murder to require "premeditated malice." A simple instruction, in layman's terms as the original jury note requested, could have clarified that premeditation is a form of malice aforethought, but malice aforethought does not *require* premeditation. The trial court, however, elected to simply reread to the jury the same two jury instruction it had already directed the jury to reread, namely CALCRIM Nos. 520 and 521.

While the trial court faced a difficult predicament, with little assistance from counsel on how to meet the jury's questions, it fell to the court as its statutory duty to answer the jury though "guidance may not come easily to hand, or is not supplied by counsel[.]" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1047 (*Ross*).) There appears to have been little prospect that simply rereading the same instructions would resolve the matter. In *Beardslee*, the jury submitted a note requesting clarification of the instruction defining "deliberate and premeditated murder," but the trial court informed counsel he would not respond because "[e]very time a judge opens his big mouth and tries to explain what an instruction means, he puts his foot in it and the Appellate Court promptly bites it off." (*Beardslee*, *supra*, 53 Cal.3d at p. 96.) The Supreme Court explained that while the

20

judge's reluctance to strike out on his own was understandable, "a court must do more than figuratively throw up its hands and tell the jury it cannot help." (*Id.* at p. 97.) The court's duty to aid the jury may require it to "elaborate on [an] instruction after the jury expressly asks" it to do so, and "'"[a] definition of a commonly used term may nevertheless be required if the jury exhibits confusion over the term's meaning."'" (*Ross*, at p. 1047.)

Thirty minutes after the trial court reread the instructions, a juror sent another note advising the reinstruction had not helped. The trial court again interviewed the foreperson and a different group of four jurors in chambers. The foreperson again explained, "That's where our hang-up is, on the murder, definition of the murder. Some of us believe it differently." The four jurors, including the one authoring the most recent note to the court, stated variously that the foreperson "a hundred percent agreed that [under] the law [as] given to us there's no difference between first- and second-degree murder," "I don't think she understood what the law is," and that they therefore believed she was "not willing to follow the law." Then, as discussed above, the trial court interviewed the foreperson a third time, posed its two questions to her, and dismissed her even though, as discussed, her answers did not show to a demonstrable reality that she misunderstood the law or, more importantly, that she was incapable of doing so and therefore could not perform her duty.

We have assumed in our discussion, without deciding, that the trial court did not also err by delving too deeply in its multiple interviews into the jurors' deliberative mental processes. The issue is close. The trial court was cognizant of the delicate nature of its inquiry, cautioning the foreperson, "I don't want to know what your personal views are," when she began saying, "I personally believe — ." But the

21

interviews nevertheless revealed the jurors' thought processes in statements that included the foreperson's explanation for the impasse: "[S]ome of us do not believe that -- there's malice aforethought in the case and some believe -- or I should say they believe that, you know, it is the intention to kill and it's the implied, which is the types [*sic*] of -- how do you call this? -- The type of the malice aforethought."

As the Supreme Court recognized in *Engelman*, Justice Kennard in her concurring opinion in *Williams* "properly warned of the risk inherent in 'permit[ting] trial judges "to conduct intrusive inquiries into . . . the reasoning behind a juror's view of the case, *or the particulars of a juror's (likely imperfect) understanding or interpretation of the law as stated by the judge*". . . .'" (*Engelman*, *supra*, 28 Cal.4th at p. 445, italics added.) In *Williams*, Justice Kennard observed that "[r]ather than asking only whether Juror No. 10 was willing to follow the court's instructions on the law, the court asked questions that were likely to — and did — reveal whether Juror No. 10 was of the view that defendant should be convicted or acquitted of the crime of unlawful sexual intercourse, and the reasons for that view." (*Williams*, *supra*, 25 Cal.4th at p. 465 (concur. opn. of Kennard, J.).) Justice Kennard noted "[t]his unnecessarily broad inquiry may well have infringed upon the secrecy of the jury's deliberations," but she did not reach the issue because the defendant had not raised it in his petition for review, which centered on the allegedly unfettered right of jury nullification. (*Ibid.*)

Here, the matter was complicated by the jury's express request for aid in understanding "malice aforethought," which the trial court was duty-bound to answer. But we need not reach the issue of whether the trial court in attempting to answer the question delved too far into the jury's deliberative process. As discussed, the trial court's colloquy with the foreperson did not establish as a demonstrable reality that she not only

misunderstood the law, but was incapable of comprehending it.  The trial court therefore erred in dismissing her.

III

DISPOSITION

The judgment is reversed.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.

23